McGEE, Chief Judge.
 

 *389
 
 I.
 
 Factual and Procedural History
 

 A.
 
 General
 

 Celina Quevedo-Woolf ("Plaintiff") and Daniel Carter ("Carter") had a brief romantic relationship that resulted in the birth of E.R.Q., a girl, on 19 July 2005. Carter has had minimal involvement in E.R.Q.'s life and is not a party to this appeal. Plaintiff's mother, Merry Eileen Overholser ("Defendant") has raised E.R.Q. since infancy. When Plaintiff realized she was pregnant she moved in with Defendant, who was living in Defendant's mother's house (the "house"), in Palm Beach County, Florida. After E.R.Q. was born, Plaintiff continued to live with Defendant. Though E.R.Q. initially slept in Plaintiff's room, for the majority of the time Plaintiff and E.R.Q. were living in the house, E.R.Q. slept in Defendant's room.
 

 Plaintiff moved out of the house around the time of E.R.Q.'s first birthday, leaving E.R.Q. with Defendant, because, according to Plaintiff, Plaintiff was not getting along with Defendant, and for "stability for E.R.Q." Plaintiff testified she left E.R.Q. with Defendant because E.R.Q. already "kn[ew] my
 
 *821
 
 mother and kn[ew] that house, [so] it seemed like a logical thing at the time as opposed to me moving out into a friend's house, which I did, and [E.R.Q.] not being familiar with the situation or anything like that." Plaintiff's initial apartment was nearby, and Plaintiff testified she visited E.R.Q. but that "it was kind of sporadic," "weekly." Plaintiff never kept E.R.Q. overnight during this initial period.
 

 In order for Defendant to have the authority to make decisions necessary for raising E.R.Q., such as decisions for medical care, Defendant
 
 *390
 
 asked Plaintiff to give Defendant legal and physical custody of E.R.Q. Plaintiff agreed, and the Circuit Court of the Fifteenth Judicial Circuit for Palm Beach County, Florida (the "Florida court"), entered an "Order for Temporary Custody" on 2 November 2006 (the "Florida Order"), giving sole legal and physical custody of E.R.Q. to Defendant. E.R.Q. was one year old at the time. The Florida Order allowed Plaintiff to petition for the return of custody of E.R.Q. to Plaintiff. After Defendant obtained custody, Plaintiff continued to have semi-regular contact with E.R.Q., but E.R.Q. lived full-time with Defendant and Defendant made all relevant decisions related to the care of E.R.Q. In 2007, Defendant filed for, and obtained, an order for child support from Plaintiff.
 

 In June of 2008, when E.R.Q. was approximately three years old, Defendant and E.R.Q. moved with Defendant's girlfriend at the time, Janet Kresge ("Kresge"), to Rowan County, North Carolina. Defendant had been a special education teacher since 1984, and continued working in that capacity in North Carolina. Plaintiff testified she did not want Defendant to leave Florida with E.R.Q., but Defendant testified that, when she discussed with Plaintiff the idea of moving to North Carolina, Plaintiff "thought it was a great idea and [Plaintiff] said she was coming" to North Carolina to be near E.R.Q. Plaintiff did not move to North Carolina, and did not visit E.R.Q. in Rowan County until October 2008, when Defendant purchased Plaintiff a plane ticket for that purpose. A note written by Kresge concerning that time period stated:
 

 April, 2008. Discussed moving [with Plaintiff]. Better standard of living, et cetera. Was told [Plaintiff] would follow in a few months. Looked for apartments. Sent info to [Plaintiff]. October, 2008 visit [-] three days. [Plaintiff] [s]pent most of time on computer or phone. Did not spend ... quality time [with E.R.Q.]. Promised to be back for Thanksgiving. No contact.
 

 Defendant testified that, based upon her own observations, what Kresge had written in the note was correct. Plaintiff's next visit with E.R.Q. did not occur until May of 2011, approximately two and a half years after the October 2008 visit. The May 2011 visit was a day visit that lasted only a few hours.
 

 Defendant testified that she and Kresge offered to let Plaintiff live with them and E.R.Q., but Plaintiff did not take them up on that offer. Defendant further testified:
 

 A After [Plaintiff] came in October [2008] I did not hear from her for quite some time.
 

 *391
 
 Q Was it true that [Plaintiff] didn't have your phone number when you lived in North Carolina?
 

 A No.
 

 ....
 

 Q Do you know where [Plaintiff] was at during that period of time when she had no contact?
 

 A No, I don't.
 

 Q When you say no contact, do you mean no phone calls, no visits, or what?
 

 A Correct. There were-there were no visits from-the next visit did not happen until [3] May, 2011. [Plaintiff] did call on-there were a couple of Christmases where she called. I remember one phone call at Christmas time, and it had been quite a while since I had spoken to her, where she-she told me that she was suicidal and some other things, and things surrounding why she felt that way. There was another phone call. She usually called like May. May and December. And I remember one May she called and I said something to her about [E.R.Q.]'s birthday the previous year. That she never called [E.R.Q.]. And I said, "Why didn't you do that? You didn't even call her?" And she said, "Mom, honestly I forgot." And then there was May
 
 *822
 
 of-I believe it was 2010, because [Kresge] was still there. And we were in the backyard and [Plaintiff] called and she just started screaming at me, "Give her back to me. You have to give her back to me. She's mine. I'm coming to get [E.R.Q.]." And I said, "[Plaintiff], you don't even know her." And she said, "Well, that's okay. I'll come for the weekend and I'll spend the weekend with her and then I'm taking her back with me." And I said, "No." And it was like I had to try to talk her down.
 

 Q So we're talking about-and I want to make sure I'm right on this. We're talking [6] October, 2008, well into May of 2011 here [that Plaintiff had no physical contact with E.R.Q.], right?
 

 A Yes.
 

 ....
 

 *392
 
 Q Did you go through periods like that where you wouldn't hear from [Plaintiff] for a long time and then suddenly you would get demands to turn [E.R.Q.] over to her?
 

 A Yes.
 

 Q Do you even know where [Plaintiff] was living at that point in time or who she was living with?
 

 A No. I know at one point [Plaintiff] told me that she married Michael. And I didn't know-I don't believe I knew specifically where she lived.
 

 Q Did you know that [Plaintiff had] married a guy-or had moved to West Virginia for a while or something, or was that later?
 

 A That was Michael[.] And my recollection is that when we had-we had talked about moving-we had all talked about moving to North Carolina, and [Plaintiff] said it was a great idea and she was all gung-ho. And then-and then at that point I'm not sure if they were living-I know for a while [Plaintiff and Michael] were living in an apartment. For a little while I think they were living with Michael's mother. And we had looked at a house online [for Plaintiff in North Carolina]. So ...
 

 Q When you say "we looked at a house online," who looked at a house online?
 

 A [Plaintiff] and I and [Kresge].
 

 Uncontested findings of fact from the order Plaintiff appeals in this matter-Judge Marshall Bickett's 16 May 2016 Custody Order (the "Bickett Order")-show that Defendant moved to North Carolina with E.R.Q. in June of 2008, and that Plaintiff visited E.R.Q. in North Carolina in October of 2008.
 

 On 1 June 2009, approximately eight months after Plaintiff's October 2008 visit with E.R.Q. in North Carolina, Plaintiff filed a motion in Florida requesting that the Florida Order be terminated and that custody of E.R.Q. be returned to Plaintiff. In that motion, Plaintiff alleged the following as grounds for regaining custody of E.R.Q.: "I have maintained steady employment and have proper housing for [E.R.Q.]. I am also recently married[,]" and that E.R.Q. "would be back with the birth mother, and [she] would be better off living back in Florida with me and her immediate family." Three months later, on 1 September 2009,
 
 *393
 
 Plaintiff sent Defendant an email stating that she wanted to regain custody of E.R.Q. Plaintiff stated that signing custody of E.R.Q. over to Defendant "was the best thing for [E.R.Q.] at that time and I don't regret my decision but [E.R.Q.] belongs with me[.]" Plaintiff stated that sometimes she felt like Defendant did not love her, "[b]ut when I think that I always revert back to my past because if you didn't love me you wouldn't support me the way that you did." Plaintiff stated: "I am not going anywhere and I have every intention of fighting to get my wonderful daughter home with me."
 

 Approximately eight months later, on 4 May 2010, the Florida court entered a "Notice of Lack of Prosecution" in which it informed Plaintiff that there had been "no activity" in the action "for a period of 10 months immediately preceding service of this notice" and that absent some action on the part of Plaintiff to move the matter forward within sixty days, a hearing would be held on 1 July 2010 "on the court's motion to dismiss for lack of prosecution[.]" Plaintiff did not respond to the "Notice of Lack of Prosecution," and the Florida court dismissed Plaintiff's Florida action for lack of prosecution by order entered 15 July 2010. Plaintiff did not
 
 *823
 
 visit E.R.Q. between the filing and dismissal of the 2009 Florida action.
 

 In uncontested findings of fact from the Bickett Order, the trial court found as fact that "[in] October of 2008 [ ] Plaintiff visited with [E.R.Q.] in the state of North Carolina. After this visitation, [ ] Plaintiff stopped visiting with [E.R.Q.]," and that "during the years 2009 and 2010 [ ] Plaintiff had no physical contact with [E.R.Q.]" even though "Plaintiff had the ability to visit with [E.R.Q.] during this period of time." Plaintiff testified as follows concerning this period:
 

 Q Isn't it true that for a lengthy period of time for more than a year back in about 2010, 2011 you didn't have any contact with your daughter at all?
 

 A No, that's not true.
 
 I tried to call my daughter several times
 
 .
 

 Q What's the longest time you've went without seeing or talking to your daughter?
 

 A Seeing her has always been longer. I
 
 think
 
 there were a couple of years where I didn't see her.
 

 Q Do you remember when those years were?
 

 A 2008-well, no, I think-I believe I saw her in 2008. I think maybe 2009-I saw her in 2010, didn't I, or-I think
 
 *394
 
 it was 2009 and 2010 was the years that I didn't see my daughter. (Emphasis added).
 

 Plaintiff met Jeff Woolf ("Woolf") in late 2010, and moved to New York in April 2011 to live with him. Plaintiff's May 2011 visit with E.R.Q. appears to have occurred by happenstance. Plaintiff was in Charlotte for reasons unrelated to E.R.Q., so she called Defendant and asked if she could come visit E.R.Q. Defendant agreed, Plaintiff took a train from Charlotte to Salisbury, and Defendant picked her up. Defendant testified that Plaintiff visited with E.R.Q. "for a few hours" then returned to Charlotte by train. Plaintiff's description of this visit was that it was "short, but it was fine."
 

 Plaintiff and Woolf were married in New York in January 2012, and Woolf apparently paid for Defendant and E.R.Q. to attend. Plaintiff visited North Carolina to see E.R.Q. again in 2012, at some time close to E.R.Q.'s July birthday. In the approximately four-year period between June 2008 and the summer of 2012, Plaintiff had seen her daughter only four times: three times in North Carolina, and once in New York. For a brief period in 2011 and early 2012, it appeared that Plaintiff and Defendant were getting along reasonably well, and Plaintiff was maintaining regular phone contact with E.R.Q. However, email exchanges between Plaintiff and Defendant show that by at least May 2012 relations had become seriously strained. The strain in the relationship between Plaintiff and Defendant was likely caused or exacerbated by the fact that in May 2012 Plaintiff told Defendant that Plaintiff was going to regain custody of E.R.Q., move her to Texas to live with Plaintiff and Woolf, and that Defendant could not prevent that from happening.
 
 [1]
 

 Defendant, who had naturally developed a very close bond with E.R.Q., was opposed to Plaintiff's plan. E.R.Q. was seven years old at this time, and Plaintiff had not been a consistent or reliable part of E.R.Q.'s life since Plaintiff had moved out of the house and left E.R.Q. in Defendant's care when E.R.Q. was one year old. Plaintiff recounted the 22 May 2012 phone conversation with Defendant concerning Plaintiff's desire for custody as follows:
 

 And [Woolf and I] actually moved into a two bedroom apartment, and we knew that we were moving into a two-bedroom apartment. And I had reached out to [Defendant], and it was the summer. And I had said to her, "You know,
 
 *395
 
 we're setting things up for [E.R.Q.] to come live with us, and I think it would be a great transition if [E.R.Q.] would stay with you the majority of the summer, then come up the month before schools starts, and that way we could get her into some programs in the area and get her into some friends and introduce her to the school and things like that, and then we can work on visitation." And I believe [Defendant's] response was
 
 *824
 
 something like over her dead body would [E.R.Q.] ever live with me.
 

 Plaintiff emailed Defendant later that same day, stating:
 

 I want you to know that I love the both of you very much and that I hope that you will be able to take the next month and a half to two months to help [E.R.Q.] get ready for the move. I think that there are some things that we need to be on the same page about. But before we get started, there is something we need to address. You keep saying that you have custody of [E.R.Q.]. Back in 2006, I signed temporary custody. I didn't give up my rights. It was for a specific determined amount of time that I can revoke at any time, and it was never permanent. I really hope that you can take the time with [E.R.Q.] to talk to her about the move and all the great things about it such as soccer and getting to decorate a new room. I want you to have a relationship with your granddaughter. With this move to Texas, [E.R.Q.] will be in a great school district. She will be involved in all the things she loves like soccer and playing the violin. I would really like it if you could talk to her about a couple of things that would help her with the move such as looking forward to visits with you, camp, a new school, and new friends and a whole new place to discover and make her own. Just like you asked me not to speak to [E.R.Q.] about this and I said I wouldn't without speaking to you first, I expect as you guys have your conversations she is going to have some questions for me, and that is when I will talk to her about it.
 

 B.
 
 Procedural History for the Appeals in COA17-675
 

 Plaintiff filed a "Notice of Registration of Foreign Child Custody Order" with the Clerk of Court, Rowan County, on 25 October 2012, for the purpose of ensuring that the Florida Order could be enforced by the Rowan County district court (the "trial court").
 

 *396
 
 N.C. Gen. Stat. § 50A-305 (2017). Plaintiff filed a "Motion in the Cause for Modification of a Prior Order" ("Plaintiff's Motion") on 15 November 2012, initiating this action ("Plaintiff's Action"). Plaintiff's Motion requested that the trial court modify the Florida Order pursuant to the provisions of the "Uniform Child-Custody Jurisdiction and Enforcement Act" ("UCCJEA") and
 
 N.C. Gen. Stat. § 50-13.7
 
 (2017), which allows "upon [the North Carolina court] gaining jurisdiction, and a showing of changed circumstances, ent[ry of] a new order for custody which modifies or supersedes" an order originally entered in another state. N.C.G.S. § 50-13.7(b).
 

 Defendant filed her responsive pleading to Plaintiff's Motion, Defendant's "Motion to Dismiss and for Permanent Custody," on 8 January 2013. In this motion, Defendant alleged in part:
 

 9. .... [D]efendant took care of [E.R.Q.] in the evening and Plaintiff put her in day care and stayed out and partied all night. At some point she just stopped coming home. By January 2006 Plaintiff had abandoned child with Defendant and "took off." ....
 

 10. Defendant and [E.R.Q.] moved to North Carolina June 2008[;] prior to that visitation was very sporadic and Plaintiff never asked to take [E.R.Q.] home, for even a night. ....
 

 11. Defendant filed for custody in Florida in 2006 after [E.R.Q.] got hurt and she did not know where Plaintiff was living so [Defendant] could obtain emergency medical treatment for [E.R.Q.]. In September 2006, Plaintiff gave [Defendant] a child care power of attorney, but when Plaintiff stopped coming around at all Defendant requested that [Plaintiff] consent to a custody order and she agreed to this. .... Plaintiff is in arrears $7,408.06 on child support and Defendant last obtained child support from [Plaintiff] last week for $90.00. Plaintiff is supposed to be paying $90.00 per week. From January 2012 till October 2012 [Plaintiff] paid nothing.
 

 12. Defendant and [E.R.Q.] moved to NC in June 2008 and Plaintiff was supposed to come with them; however [Plaintiff] never showed up because she decided to move with a boyfriend and his mom to West Virginia. [Plaintiff and her boyfriend] later married and divorced. Plaintiff's visits
 
 *825
 
 since 2008 were sporadic. In October 2008, Defendant paid $300.00 for airfare so Plaintiff could visit.
 
 *397
 
 She stayed the weekend and stated she would return for Thanksgiving however never returned. She did not ask to take [E.R.Q.] home with her.
 

 13. Defendant has never denied Plaintiff visitation. [Defendant] has paid for airfare once and even flew with [E.R.Q.] to New York for Plaintiff's wedding [to Plaintiff's] present husband. Defendant did not hear from Plaintiff at all for two and one half years and only received sporadic child support from Plaintiff's tax returns or frequently from unemployment compensation.
 

 14. In May 2011, Plaintiff called from Charlotte and wanted to see [E.R.Q.] [ ] Defendant agreed. [Plaintiff] took the train from Charlotte[,] stayed 3 hours[, and] said she had moved to NYC. [Plaintiff] did not ask to stay and went back to Charlotte. [E.R.Q.] asked her to stay and [Plaintiff] was invited and did not stay. [Plaintiff and E.R.Q.] started talking more and Defendant started call[ing] every weekend and was pretty consistent. In November 2011, [ ] Defendant asked Plaintiff to come for Christmas and [Plaintiff] did [and] she stayed 3 days, then Plaintiff invited Defendant and [E.R.Q.] to NYC to her wedding in January 2012..... The parties had a good time but they only got to see Plaintiff for small intervals over the weekend.
 

 15. Plaintiff and [Woolf] moved to Texas in May ... of 2012 and Plaintiff sent an email that they were moving to Texas and said "we are taking [E.R.Q.] with us and you need to take the next 4 to 6 weeks to prepare her." [ ] Plaintiff also told [Defendant] that the Florida Order was temporary, that [Plaintiff] could revoke it at any time and that Defendant had violated the [Florida] Order when she moved. Plaintiff also told Defendant that "unless [Defendant] cooperated, that she would never see [E.R.Q.] again." By November 2012, the pending motion was filed.
 

 ....
 

 18. Defendant is a fit and proper person to continue to have sole care custody and control of [E.R.Q.] in that:
 

 a. [E.R.Q.] is now seven years old and has never lived with anyone else other than [Defendant] and that this is the status quo for [E.R.Q.]
 

 *398
 
 b. [ ] Defendant is highly educated and gainfully employed in the Cabarrus County School System as a Resource and Inclusion teacher for Disabled and Special Needs Children with a BS in Special Education. [E.R.Q.]'s condition is causing some learning issues and she is especially qualified to care for [E.R.Q.]
 

 c. [ ] Defendant has for the past seven years successfully cared, support and loved [E.R.Q.] with scant help or contact with the Plaintiff or the biological father, keeping a roof over her head, food in her stomach and dealing with a dangerous medical condition. [E.R.Q.] is happy, relatively healthy other than [what] has been stated and well-adjusted and making excellent progress in school.
 

 d. That a move at the age of seven years old to a mother that she does not really even know would likely be traumatic to [E.R.Q.] and not be in her best interests.
 

 Defendant requested,
 
 inter alia
 
 , that the trial court award Defendant permanent custody of E.R.Q., and grant Plaintiff supervised visitation with E.R.Q.
 

 Plaintiff and Defendant entered into an agreement, which was then entered by the trial court as a "Temporary Consent Order," on 1 May 2013. This order determined that "it [wa]s in the best interests of [E.R.Q.], pending further hearing in the matter, that Defendant [ ] maintain primary legal and physical custody of [E.R.Q.]." The order further granted Plaintiff rights of visitation, information sharing, and contact that were not provided for in the Florida Order. Although the May 2013 order did not grant Plaintiff the right to overnight visits with E.R.Q., Defendant apparently independently consented to allow E.R.Q. to visit Plaintiff in Virginia in October of 2014. This 2014 visit was the first time E.R.Q. had an overnight visit with Plaintiff without Defendant's supervision in over six years. A temporary order was entered on 5 November 2014 officially granting Plaintiff multi-day unsupervised visitation
 
 *826
 
 with E.R.Q., on specific dates, at Plaintiff's home in Virginia.
 

 The hearing on Plaintiff's motion to modify the Florida Order commenced on 3 March 2015, Judge Bickett presiding, continued over ten non-consecutive days until 16 July 2015, and included the testimony of many witnesses. At the end of that hearing, Judge Bickett expressed his concern about the apparent animus between Plaintiff and Defendant, and between their counsel. The following exchange occurred between
 
 *399
 
 Judge Bickett and Plaintiff's attorney concerning how Plaintiff had argued her case:
 

 BY THE COURT: I mean, you and [Plaintiff] ... have filed a motion to register the [Florida Order] and ask that it be modified based upon substantial change of circumstances. And now you're here saying, well, best interest controls and substantial change of circumstances doesn't control.
 

 BY MR. CAMERON: Well, I don't think I've necessarily ... said that. I think there has been a substantial change in circumstances affecting the welfare of the minor child. And I think ... coupled with that, the best interests are that she needs to be with [Plaintiff].
 

 Judge Bickett stated:
 

 I have no clue as to what I'm going to do still. I'm going to have to go back and read my notes and-I mean, I do know that you-that with your permission I talked to [E.R.Q.] in chambers and she expressed a preference as she wants to keep things the way they are. And I do know the suicide scares me to death. I mean, and you all presented absolutely minimal evidence as to that and that should have been one of the most important aspects of this case is what's going to happen to her if I move her. I mean, and you all just sort of, "Oh, no. It's no big deal there." It scares me to death.
 

 Judge Bickett decided to continue the matter until 30 July 2015. A proceeding was held on 30 July 2015. In this hearing, Judge Bickett recounted some of the evidence before him, and discussed his concerns that, despite the lengthy trial, the parties had failed to focus on the relevant issues-change of circumstances and best interest of E.R.Q.:
 

 [F]or me to modify [the Florida Order], there has to be a material and substantial change of circumstances affecting the welfare of [E.R.Q.]. And you have to show that it's in the best interest of [E.R.Q.]. There's been marginal evidence, at best, on affecting the welfare of the child. And there's been less evidence on best interest. I mean, this has all been about "what is best for me," not what is best for this young child. However, and [Defendant's attorney] Mr. Paris's argument that this is the second motion with basically the same allegations-I've got a new husband,
 
 *400
 
 I've got a new job, and I'm stable-I am going to find that there is substantial change of circumstances affecting the welfare of the child. It concerns me deeply that-as I said before, that this young lady came in and testified that she liked being with [Defendant] and that there is evidence of suicidal ideation or some type of psychological problem that you all just didn't bother to think should be a part of this trial, to the extent, I think the best interest is the most important portion of this trial, and you all just sort of-even though you took-this is probably one of the longest trials we've had in this county in the last ten years I've been a judge-you just have ignored best interest. So I'm going to do a temporary order. I'm going to make a finding that this is a high-conflict case and that both parents-both [Plaintiff] and [Defendant] have the means to pay for a parenting coordinator. I'm going to appoint Mary Blanton as a parenting coordinator. .... I think [E.R.Q.'s] relationship with [Plaintiff] needs to be repaired, and I think I would like nothing better [than] to give custody back to [Plaintiff]. But, ma'am [Plaintiff], Mr. Cameron [Plaintiff's attorney] argued that I should treat this as a juvenile case. If this was a neglect and abuse case, I would have terminated your parental rights eight years ago, or seven years ago. Because the key in that court is permanency. The child has to have a permanent plan. [Y]ou do one year of trying to repair things and get the relationship back with the mother, and if that doesn't work out, then you terminate rights and give the
 
 *827
 
 child to a parent or a person that will give the child some type of stability and permanency. And the only permanency [E.R.Q.] has had is with [Defendant]. Now, it concerns me that you all do not like each other, or you all are not getting along. I don't know that I can fix that, but we need to look at what's best for your daughter, and your granddaughter. And I don't-I think pulling her out of [Defendant]'s house when she expressed a preference, and when there's psychological issues that I don't know what they are. I do know that a ten-year-old, if you force her to do something, is going to do something drastic to do whatever she wants to do. And this young lady is a very smart young lady. I just don't want her to do something bad. I don't have confidence that you all can work it out between yoursel[ves] because you
 
 *401
 
 haven't done that because of the animosity that you have. But I do feel confident that we can do something, if you want your relationship repaired, to repair it. And then if you get it repaired, then I can look at best interest, and if-it may be in her best interest that she go back to you [Plaintiff]. But I don't know that now because you all-because of the evidence that's been presented.
 

 Judge Bickett entered his first order in this matter on 30 July 2015, the same day as the proceeding. This temporary order was limited to visitation, stated that the "merits of this case are still pending, with the next hearing date to be scheduled in February or March, 2016[,]" and further stated that the order was "entered without any prejudice to either party." On 24 February 2016 Judge Bickett entered a second order based on the 30 July 2015 proceeding, in which he made findings and conclusions expressing the same concerns he had discussed at the proceeding, ruled that a parenting coordinator should be appointed, granted Plaintiff more access to E.R.Q., and left the matter open for further action. Judge Bickett made no conclusion in this order that there had been any change in circumstances affecting the welfare of E.R.Q.
 

 The next hearing was conducted on the same day the 24 February 2016 order was entered. In this 24 February 2016 hearing, Plaintiff testified that she would like "the judge to allow [E.R.Q.] to come live with [Plaintiff] as soon as today[.]" Over Plaintiff's objection, E.R.Q., then approaching eleven years old, testified. E.R.Q. was clearly nervous initially, and Plaintiff and Defendant agreed to leave the courtroom so E.R.Q. would not have to answer questions in front of them. Judge Bickett attempted to calm E.R.Q., and let her know that her testimony was not going to determine with whom she was going to live. Judge Bickett told E.R.Q. he was "just trying to figure out what is best for you, and I'm trying to figure out a way for you to have a better relationship with [Plaintiff]. But ... I want to find out just what you want. Okay?" E.R.Q. responded: "I want to live in North Carolina." E.R.Q. explained a number of the reasons she preferred to remain in North Carolina. When asked about her visits with Plaintiff, E.R.Q. testified that the visits went "[g]ood. I don't know why, but I always end up angry at the end." E.R.Q. testified that she would be happy to have more time to visit Plaintiff over the summer, but when Judge Bickett inquired: "Tell me, you used to not have a relationship with your mom. Do you like having one?" E.R.Q. responded: "Yes. But I think she pushed it too far when she put it in court." E.R.Q. testified that the reason she does not talk with Plaintiff on the phone sometimes is that she has a lot of schoolwork and
 
 *402
 
 is otherwise busy, or because she has fallen asleep. She testified that Defendant never prevents her from talking to Plaintiff.
 

 E.R.Q. testified that she is sometimes sad to leave Virginia because she has "such a good time" in Virginia. She stated that Plaintiff and Woolf "buy a lot of stuff for" her, and that her bicycle in North Carolina was broken. However, when asked if she was "getting as much time with [Plaintiff] as you want for right now," E.R.Q. answered: "Yes." When asked how her life was going at Defendant's house, E.R.Q. answered: "Good. I love it there. The only thing is that Henry [her dog] is wild. I love that dog though." When asked if it seemed that Defendant had less money than Plaintiff, E.R.Q. answered: "I've never cared or thought of that." E.R.Q. testified that she gave Defendant a necklace that was "a diamond crusted heart [that] says
 
 *828
 
 'Mom[,]' " which she bought with money she earned and quarters she finds "laying on the ground my mom [Defendant] leaves there on purpose." E.R.Q. testified that she calls both Defendant and Plaintiff "mom," and that she was "lucky to have two moms." She reflected on having two moms, saying: "Oh, it's been the same since-when [Kresge] was around, and I didn't even know [Plaintiff], I had two moms. [Kresge] left, then I get [Plaintiff]. Two moms."
 
 [2]
 
 When asked if she would have any problems if the trial court decided she would have to live with Plaintiff and go to school in Virginia, E.R.Q. answered: "It would take me about three years to adjust to that, because that's how long it took me to make all my friends from Salisbury." E.R.Q. explained that she believed "[Defendant] and [Plaintiff] need to communicate more." Finally, E.R.Q. testified: "I love both my mothers equally."
 

 Judge Bickett expressed concerns over "nuances to family law that you all haven't really argued here that really worried me to death on this case." Recognizing that, pursuant to N.C.G.S. § 50-13.7, he first had to find a change of circumstances affecting the welfare of E.R.Q., and only then consider the best interests of E.R.Q., Judge Bickett asked: "If I find that hasn't happened
 
 [
 

 3
 

 ]
 
 then it reverts-then I dismiss your action. If I do that, what does it do to the temporary orders that are entered?" Defendant's attorney stated that he thought all the visitation orders would be "gone" if the trial court denied Plaintiff's underlying motion to modify custody pursuant to N.C.G.S. § 50-13.7. Judge Bickett responded:
 

 *403
 
 I think they're gone, too. I mean, you all aren't-aren't conversing. I mean, it's obvious [E.R.Q.] expressed a preference. .... From 2005 to 2010 ... [Plaintiff] was pretty much nonexistent. As I said from the last time, there are at least three grounds under North Carolina law where I could terminate [Plaintiff's parental] rights, and I would have terminated her rights if it were a neglect case. It's also, you know, since 2012 when she filed this lawsuit she's been totally in. I mean, she's really been doing what she's supposed to do. But a child needs permanency. They need to have the same thing from day to day and [Plaintiff] hasn't done that. I mean, she's gotten-she's very involved now. I'm going to take it under advisement. I need to figure out how to structure an order that is in [E.R.Q.'s] best interest. I mean, I could easily say your motion's denied and then I don't know where we're left. I don't think that it is in [E.R.Q.'s] best interest that she not have a strong relationship with her mother, and that's what I was trying to do.
 
 That's why I tried to do this order to get you more and more time with her so to develop a strong relationship and to do something over the summer where your client had extended time with her. But obviously you [ ]all didn't want that
 
 . So I'll make a decision and I'll figure out how I can do my order. But I need to think about it and reread some of the North Carolina law to figure out how I can structure an order that will help her in the best interest. And I'm not exactly sure based upon the pleadings and what you all are asking for how I can do that. But I'll figure it out. (Emphasis added).
 

 From Judge Bickett's remarks at the hearing, it appears to this Court that his opinion at that time was that Plaintiff had not met her burden under N.C.G.S. § 50-13.7, but that he did not believe E.R.Q.'s best interest would be met if the result of denial of Plaintiff's motion to modify custody might lead to Plaintiff losing all visitation rights, so he was going to review the relevant law and try and find a way to preserve visitation between Plaintiff and E.R.Q.
 

 Plaintiff filed a motion in the cause on 22 April 2016 seeking to be allowed to present additional evidence to the trial court, and seeking a show cause order against Defendant for violating terms of the 1 May 2013 temporary consent order. A hearing was conducted on 12 May 2016, but Plaintiff's motions were not considered because Defendant's attorney informed the trial court that
 
 *829
 
 he no longer had a working
 
 *404
 
 relationship with Defendant, and Judge Bickett continued the matters because he would not proceed on Plaintiff's motion's if Defendant did not have appropriate representation. The following day, 13 May 2016, Plaintiff filed a "Motion for Mistrial and Motion for Recusal," arguing,
 
 inter alia
 
 , that Judge Bickett demonstrated bias against Plaintiff during the prior hearings and had not acted in a timely fashion to the prejudice of Plaintiff. Plaintiff also argued that, during the 24 February 2016 hearing, "immediately after issuing a written order that stated that Plaintiff had shown a substantial change of circumstances ... Judge Bickett announced that there had been no substantial change of circumstances." Review of both the 24 February 2016 order and the 24 February 2016 hearing show that Judge Bickett did not reach a conclusion on the issue of substantial change of circumstances affecting the welfare of E.R.Q. in either the order or the hearing. Plaintiff also stated in her motion that she was filing a complaint against Judge Bickett with the North Carolina Judicial Standards Commission. Plaintiff requested that a mistrial be declared in the matter, and that "a new judge be appointed to hear the merits of the case[.]"
 

 Judge Bickett entered the custody order from which Plaintiff currently appeals-the Bickett Order-on 16 May 2016. The Bickett Order concluded that Plaintiff had "failed to meet her burden to show that there has been a substantial and material change of circumstances affecting the welfare of" E.R.Q., and that Plaintiff had "acted inconsistently with her constitutionally protected status to parent her child[.]" Judge Bickett denied Plaintiff's Motion to modify the Florida Order, and Plaintiff's Action was dismissed.
 

 Plaintiff filed a "Motion for a New Trial" pursuant to N.C. Gen. Stat. § 1A-1, Rule 59 (2017), on 23 May 2016. Plaintiff filed an affidavit from Florida attorney Craig A. Boudreau ("Boudreau") on 22 August 2016, in which Boudreau cited to provisions of Florida law-including Florida's UCCJEA statutes-that Boudreau suggested demonstrated jurisdiction had remained with the Florida court. Boudreau further contended a Florida statute, not N.C.G.S. § 50-13.7, should have determined the proper standard to apply when considering whether to modify the Florida Order. The Boudreau affidavit appears to be the first record evidence challenging North Carolina's jurisdiction to act in Plaintiff's Action, and the first indication that Plaintiff was going to argue that Florida law controlled the outcome in Plaintiff's Action. Plaintiff's new argument was that the sole relief Plaintiff had requested in this matter
 
 [4]
 
 -modification
 
 *405
 
 of the Florida Order based upon a change of circumstances as required by N.C.G.S. § 50-13.7 -was not justified under the law.
 

 A new judge, Judge James Randolph ("Judge Randolph"), became involved in the case by at least 24 August 2016, as the record demonstrates that he presided over a hearing on that date. Judge Bickett recused himself from the matter by order entered 6 September 2016. If the 24 August 2016 hearing was recorded, it has not been included in the record, though we note that this hearing occurred after Plaintiff had filed her Rule 59 motion and the Boudreau affidavit, and therefore subsequent to the time Plaintiff alleges that she became aware that North Carolina had never obtained jurisdiction in this matter. Judge Randolph entered a temporary custody order on 7 September 2016, based upon the 24 August 2016 hearing, in which he concluded that the trial court had subject matter jurisdiction, North Carolina was E.R.Q.'s home state, and in which he ordered certain specific visitation provisions. This order did not acknowledge any jurisdictional or choice of law concerns raised by Plaintiff.
 

 Plaintiff's Rule 59 motion for a new trial was heard on 7 September and 19 October 2016.
 
 [5]
 
 The order from which Defendant appeals
 
 *830
 
 was entered by Judge Randolph on 17 November 2016 (the "Randolph Order"). In the Randolph Order, the trial court addressed the new arguments raised by Plaintiff involving jurisdiction and Florida law. Judge Randolph ruled that the trial court had never obtained subject matter jurisdiction pursuant to UCCJEA requirements, and therefore, effectively, that all prior orders entered by the trial court were void. However, the trial court included conclusions of law unrelated to subject matter jurisdiction, namely: "The [trial court] finds that there exist sufficient grounds under North Carolina Rules of Civil Procedure Rule 59 to warrant a new trial, if this [c]ourt obtains subject matter jurisdiction. This [c]ourt should give Full Faith and Credit to Florida law." Based upon its findings and conclusions, the trial court ordered:
 

 1. Plaintiff's Motion for New Trial is granted, if Florida releases subject matter jurisdiction to North Carolina.
 

 2. [That Judge Randolph would contact the appropriate judge in Florida to seek release of jurisdiction.]
 

 *406
 
 ....
 

 4. As the [Florida Order] originated in Palm Beach County, Florida, Florida law applies to the interpretation of said order.
 

 Following entry of the Randolph Order, the trial court entered a "Formal Order from Consent Judgment/Order" on 13 December 2016, in which it modified a visitation provision of the 7 September 2016 temporary custody order. Defendant filed notice of appeal from the Randolph Order on 16 December 2016. Plaintiff filed notice of appeal from the Bickett Order on 19 December 2016.
 

 C.
 
 Procedural History for Appeal in COA17-1344
 

 Plaintiff filed a "Verified Motion in the Cause to Terminate Order for Temporary Custody" on 4 January 2017 (the "Verified Motion"), under the same case number assigned to Plaintiff's prior action. In that motion, Plaintiff requested that the trial court make a determination that Plaintiff was "a fit parent and able to assume all parental responsibilities" for E.R.Q. and thereupon order the Florida Order "be terminated pursuant to Ch. 751.05(6), Florida Statutes." The Florida court entered an order purporting to "transfer" jurisdiction to North Carolina on 21 February 2017. A hearing was conducted on the Verified Motion on 14 March 2017. The trial court entered a "Child Custody Order" on 28 March 2017 (the "2017 Order") in which it found that the "State of Florida ... transferred jurisdiction of this child custody matter to the State of North Carolina" on 21 February 2017. The trial court, applying Florida law, concluded that Plaintiff was "a fit parent" and "a proper person to assume legal and physical custody of" E.R.Q. Based upon these findings, the trial court "ordered, adjudged and decreed" that the Florida Order was terminated; that the 2017 Order "supersedes and vacates all other North Carolina Orders in this court file[;]" that "Plaintiff shall have legal and physical custody of" E.R.Q., and that E.R.Q. "shall transition to live with Plaintiff [ ] in Herndon, Virginia" on 2 April 2017. No provisions for visitation between E.R.Q. and Defendant were included in the 2017 Order. Defendant appealed the 2017 Order on 27 April 2017.
 

 II.
 
 Appeal in COA17-675
 

 A.
 
 Plaintiff's Appeal
 

 1. Appellate Jurisdiction
 

 As an initial matter, we must determine whether this Court has jurisdiction to consider Plaintiff's appeal. Plaintiff's notice of appeal from the
 
 *407
 
 16 May 2016 Bickett Order was filed on 19 December 2016, well beyond the thirty-day requirement set forth in Rule 3(c)(1). N.C. R. App. P. 3(c)(1). Therefore, the timeliness of Plaintiff's appeal hinges upon whether Plaintiff's 23 May 2016 "Motion for New Trial" pursuant to Rule 59 served to toll the thirty-day period as allowed by Rule 3(c)(3).
 
 See
 

 Batlle v. Sabates
 
 ,
 
 198 N.C. App. 407
 
 , 413,
 
 681 S.E.2d 788
 
 , 793 (2009). In
 
 Smith v. Johnson
 
 ,
 
 125 N.C. App. 603
 
 ,
 
 481 S.E.2d 415
 
 (1997), this Court dismissed the defendants' appeal based upon the following reasoning:
 

 To qualify as a Rule 59 motion within the meaning of Rule 3 of the Rules of Appellate Procedure, the motion must "state the grounds therefor" and the grounds stated must be among those listed in Rule 59(a).
 

 *831
 
 N.C.G.S. § 1A-1, Rule 7(b)(1) (1990); N.C.G.S. § 1A-1, Rule 59(a) (1990);
 
 see
 
 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane,
 
 Federal Practice and Procedure: Civil
 
 2d § 2811, at 132 (1995) (motion that "does not sufficiently state grounds has been treated as a nullity and ineffective" for extending time for taking appeal). The mere recitation of the rule number relied upon by the movant is not a statement of the grounds within the meaning of Rule 7(b)(1). The motion, to satisfy the requirements of Rule 7(b)(1), must supply
 
 information
 
 revealing the basis of the motion.
 

 In this case the defendants indicate in the motion that they rely on Rule 59(a)(2) & (7) as the bases of their motion. There are, however,
 
 no allegations in the motion revealing any "[m]isconduct of the jury or prevailing party," N.C.G.S. § 1A-1, Rule 59(a)(2), or an "[i]nsufficiency of the evidence to justify the verdict or that the verdict is contrary to law." N.C.G.S. § 1A-1, Rule 59(a)(7)
 
 .
 

 Smith
 
 ,
 
 125 N.C. App. at 606
 
 ,
 
 481 S.E.2d at 417
 
 (citations omitted) (emphasis added);
 
 see also
 

 Meehan v. Cable
 
 ,
 
 135 N.C. App. 715
 
 , 721,
 
 523 S.E.2d 419
 
 , 423 (1999).
 

 Plaintiff's purported Rule 59 motion included bare allegations of errors pursuant to Rule 59(a), but did not allege any
 
 actual conduct
 
 that would support any of those bare allegations of error. For example, Plaintiff's motion alleged: "Plaintiff moves pursuant to Rule 59 ... for a new trial on Plaintiff's Motion to Change Custody because ... [of] insufficiency of evidence to justify the verdict, the verdict is contrary to law, errors in law occurring at trial and objected to by [ ] Plaintiff[.]" However, Plaintiff's purported Rule 59 motion included "no allegations
 
 *408
 
 in the motion revealing ... an '[i]nsufficiency of the evidence to justify the verdict or that the verdict is contrary to law[,]' " or any error of law objected to by Plaintiff.
 
 Smith
 
 ,
 
 125 N.C. App. at 606
 
 ,
 
 481 S.E.2d at 417
 
 (citation omitted). Plaintiff's motion, by simply reciting statutory language, included nothing more than bald allegations that certain statutory grounds existed-specifically those included in Rule 59(a)(1), (3), (4), (7), and (8). Plaintiff's mere recitation of grounds laid out in Rule 59(a) was insufficient to "qualify [her motion] as a Rule 59 motion within the meaning of Rule 3 of the Rules of Appellate Procedure[.]"
 

 Id.
 

 (citations omitted). To the extent the Boudreau affidavit included allegations relevant to Plaintiff's Rule 59 motion, those allegations were not part of Plaintiff's Rule 59 motion because the affidavit was not filed until 22 August 2016, and was not incorporated into Plaintiff's motion. N.C.G.S. § 1A-1, Rule 59(c).
 

 Because Plaintiff's 23 May 2016 motion did not qualify as a motion for a new trial pursuant to Rule 59, its filing did not toll the time Plaintiff had to file her notice of appeal from the 16 May 2016 Bickett Order and, therefore, Plaintiff's 19 December 2016 Notice of Appeal was not timely filed. N.C. R. App. P. 3(a)(1) ;
 
 Smith
 
 ,
 
 125 N.C. App. at 606
 
 ,
 
 481 S.E.2d at 417
 
 . Absent a timely filed notice of appeal, this Court is without jurisdiction to consider Plaintiff's appeal.
 

 Id.
 

 Although a lack of subject matter jurisdiction normally precludes an appellate court from considering the merits of an appeal, there is an exception when the lack of jurisdiction is based on failure to timely file a notice of appeal. "Our appellate courts have explained on multiple occasions that '[n]o appeal lies from an order of the trial court dismissing an appeal for failure to perfect it within apt time, the proper remedy to obtain review in such case being by petition for writ of
 
 certiorari
 
 .' "
 
 Am. Mech., Inc. v. Bostic
 
 ,
 
 245 N.C. App. 133
 
 , 137,
 
 782 S.E.2d 344
 
 , 346,
 
 disc. review denied
 
 , --- N.C. ----,
 
 784 S.E.2d 472
 
 (2016) (citations omitted). Plaintiff has not petitioned this Court for review pursuant to writ of
 
 certiorari
 
 . However, we chose to treat Plaintiff's appeal as a petition for writ of
 
 certiorari
 
 , and address her arguments.
 
 See
 

 Anderson v. Hollifield
 
 ,
 
 345 N.C. 480
 
 , 482,
 
 480 S.E.2d 661
 
 , 663 (1997).
 

 2. Plaintiff's Arguments
 

 Plaintiff argues three issues on appeal from the Bickett Order: (1) that the trial court "erred by entering the [Bickett] Order as the [trial] court lacked subject matter jurisdiction;" (2) that the trial court "erred by applying North Carolina law, rather than
 
 *832
 
 Florida law in its custody order;" and (3) that the trial court "abused [its] discretion by finding and
 
 *409
 
 concluding as a matter of law that Plaintiff [ ] had 'engaged in conduct inconsistent with her constitutionally protected status of a parent.' " We address each argument in turn, and affirm the Bickett Order.
 

 a.
 
 Subject Matter Jurisdiction
 

 Plaintiff first argues that Judge Bickett lacked jurisdiction to enter the Bickett Order. We disagree.
 

 The UCCJEA and the Parental Kidnapping Prevention Act ("PKPA") control whether courts of this State have jurisdiction to modify custody determinations entered by courts of another state.
 
 See
 
 N.C. Gen. Stat. §§ 50A-201 to 210 (2017); 28 U.S.C.A. § 1738A. It is the continuing duty of this Court to insure, even
 
 sua sponte
 
 , that the trial court had subject matter jurisdiction in every action it took. Although Plaintiff makes no argument concerning the PKPA, we have determined that the provisions of the PKPA were met in the present case. Plaintiff argues, however, that the jurisdictional requirements of the UCCJEA were not met prior to entry of the Bickett Order.
 

 Although Plaintiff bases her argument on a different statute, the requirements for
 
 obtaining
 
 jurisdiction to modify a custody order entered in another state are found in N.C.G.S. § 50A-203 -"Jurisdiction to modify determination":
 

 Except as otherwise provided in G.S. 50A-204, a court of this State may not modify a child-custody determination made by a court of another state
 
 unless
 
 a court of this State has jurisdiction to make an initial determination under
 
 G.S. 50A-201(a)(1)
 
 or G.S. 50A-201(a)(2)
 
 and
 
 :
 

 (1) The court of the other state determines it no longer has exclusive, continuing jurisdiction under G.S. 50A-202 or that a court of this State would be a more convenient forum under G.S. 50A-207 ;
 

 or
 

 (2)
 
 A court of this State
 
 or a court of the other state
 
 determines that the child, the child's parents, and any person acting as a parent do not presently reside in the other state
 
 .
 

 N.C.G.S. § 50A-203 (emphasis added).
 

 Pursuant to N.C.G.S. § 50A-201, a court of this State has jurisdiction to enter an initial custody determination if "[t]his State is the home state of the child on the date of the commencement of the proceeding[.]" N.C.G.S. § 50A-201(a)(1). In a 1 May 2013 "Temporary Consent Order," the
 
 *410
 
 trial court found and concluded, that "
 
 North Carolina is the home state
 
 of [E.R.Q.] ...
 
 and none of the parties to this action presently reside in the state of the Prior Order
 
 [Florida]." (Emphasis added). Plaintiff does not dispute either of these findings, and they are supported by the facts in this case. It is uncontested that North Carolina is the "home state" of E.R.Q. and, therefore, that the trial court had "jurisdiction to make an initial determination under G.S. 50A-201(a)(1) [.]" N.C.G.S. § 50A-203. The trial court correctly determined that none of the relevant persons-E.R.Q., Plaintiff, Defendant, or Carter-were residents of Florida at any time relevant to our jurisdictional analysis, which satisfies N.C.G.S. § 50A-203(2). Because both conditions for modification jurisdiction pursuant to N.C.G.S. § 50A-203(2) were met, the trial court had jurisdiction to consider Plaintiff's Action to modify the Florida Order, and to enter the various visitation and other orders entered in relation to the issue of E.R.Q.'s custody, including the Bickett Order.
 
 In re J.H.
 
 ,
 
 244 N.C. App. 255
 
 , 262-69,
 
 780 S.E.2d 228
 
 , 235-38 (2015).
 

 Plaintiff, however, argues that the Florida court had "exclusive, continuing jurisdiction" ("ECJ") pursuant to N.C.G.S. § 50A-202 until the Florida court released jurisdiction to North Carolina. Plaintiff is correct that a court with ECJ over a custody matter is the only court with jurisdiction to act in that matter.
 
 [6]
 

 See, e.g.,
 

 Matter of T.E.N.
 
 , --- N.C. App. ----,
 
 798 S.E.2d 792
 
 (2017). However, if the requirements for modification of a custody determination from another state pursuant to
 
 *833
 
 N.C.G.S. § 50A-203 are met, ECJ for that state will have ceased pursuant to the terms of N.C.G.S. § 50A-202. Relevant to this appeal, Florida lost ECJ because the trial court in North Carolina "determine[d] that [E.R.Q.], [E.R.Q.]'s parents, and [Defendant] d[id] not presently reside in [Florida]" at any time relevant to Plaintiff's Action. N.C.G.S. § 50A-202(a)(2).
 
 Matter of T.E.N.
 
 , --- N.C. App. at ----,
 
 798 S.E.2d at
 
 794 ;
 
 In re E.J
 
 .,
 
 225 N.C. App. 333
 
 , 336,
 
 738 S.E.2d 204
 
 , 206 (2013) ;
 
 In re N.R.M.
 
 ,
 
 T.F.M.
 
 ,
 
 165 N.C. App. 294
 
 , 298-301,
 
 598 S.E.2d 147
 
 , 149-51 (2004).
 

 Plaintiff also argues that Defendant's relocation to North Carolina violated a Florida statute and thereby caused jurisdiction to remain with the Florida court. When Defendant moved to North Carolina in July of 2008, violation of the statute in question,
 
 Fla. Stat. § 61.13001
 
 (3)(f) (2007), "subject[ed] the party in violation thereof to contempt and other proceedings to compel the return of the child[.]"
 

 Id.
 

 [7]
 
 Nothing in
 
 *411
 
 the Florida statute itself served to deprive the trial court of jurisdiction in this case. The provisions of the UCCJEA relevant to Plaintiff's argument state:
 

 (a) Except as otherwise provided in G.S. 50A-204 or by other law of this State, if a court of this State has jurisdiction under this Article because a person seeking to invoke its jurisdiction has engaged in unjustifiable conduct, the court shall decline to exercise its jurisdiction unless:
 

 (1) The parents and all persons acting as parents have acquiesced in the exercise of jurisdiction[.]
 

 N.C.G.S. § 50A-208. Even assuming,
 
 arguendo
 
 , Defendant was a "person seeking to invoke" jurisdiction in North Carolina, and that she engaged in "unjustifiable conduct" by moving with E.R.Q. to North Carolina, Plaintiff clearly acquiesced to the jurisdiction of this State by registering the Florida Order in North Carolina, and by filing her action here.
 
 Id
 
 . None of the orders entered prior to the Randolph Order, including the Bickett Order, were void for lack of subject matter jurisdiction.
 

 b.
 
 Choice of Law and Full Faith and Credit
 

 Plaintiff argues that the trial court failed to afford full faith and credit to the Florida Order, and "erred by applying North Carolina law, rather than Florida law in" the Bickett Order. We disagree.
 

 i.
 
 Child Custody Law in North Carolina and Florida
 

 We first note that in North Carolina, as in Florida, trial courts are given very broad discretion in child custody matters-whether initially or upon a request for modification of a prior custody order-based upon the universal principle that the best interest of the child shall remain paramount.
 
 See
 

 Shipman v. Shipman
 
 ,
 
 357 N.C. 471
 
 , 474,
 
 586 S.E.2d 250
 
 , 253 (2003) (citations omitted) ("As in most child custody proceedings, a trial court's principal objective is to measure whether a change in custody will serve to promote the child's best interests. Therefore, if the trial court does indeed determine that a substantial change in circumstances affects the welfare of the child, it may only modify the existing custody order if it further concludes that a change in custody is in the child's best interests.");
 
 Castillo v. Castillo
 
 ,
 
 950 So.2d 527
 
 , 528 (Fla. Dist. Ct. App. 2007) (citations omitted) ("The trial court exercises broad discretion in making a child custody determination, and its decision is reviewed for a clear showing of an abuse of discretion. .... 'Decisions affecting child custody require a careful consideration of the best interests of the child.' "). This Court "has often reiterated that the jurisdiction of the
 
 *412
 
 court to protect infants is broad, comprehensive and plenary."
 
 Massey v. Massey
 
 ,
 
 121 N.C. App. 263
 
 , 268-69,
 
 465 S.E.2d 313
 
 , 316 (1996) (citations and quotation marks omitted). "Any judgment entered by consent or otherwise, determining the custody and maintenance of minor children, may be modified by the court at any time changed conditions make a modification right and proper."
 
 Zande v. Zande
 
 ,
 
 3 N.C. App. 149
 
 , 153-54,
 
 164 S.E.2d 523
 
 , 527 (1968) (citations omitted);
 
 see also
 

 In re Marlowe
 
 ,
 
 268 N.C. 197
 
 , 199,
 
 150 S.E.2d 204
 
 , 206 (1966) ;
 
 Reed v. Reed
 
 ,
 
 182 So.3d 837
 
 , 840-41 (Fla. Dist. Ct. App. 2016). Under both North
 
 *834
 
 Carolina and Florida law generally, the provisions of a custody order remain susceptible to modification based upon a substantial change of circumstances affecting the welfare of the child and a finding that modification would be in the child's best interest.
 
 N.C. Gen. Stat. § 50-13.7
 
 (2017) ;
 
 Fla. Stat. § 61.13
 
 (2)(c) (2017).
 

 However, in both North Carolina and Florida, the burdens for modifying regular custody orders are dependent on whether the order is "temporary" or "final."
 
 See
 

 Simmons v. Arriola
 
 ,
 
 160 N.C. App. 671
 
 , 674,
 
 586 S.E.2d 809
 
 , 811 (2003) ;
 
 Jones v. Jones
 
 ,
 
 674 So.2d 770
 
 , 774 (1996). Florida, unlike North Carolina, has a special proceeding for granting "temporary" custody of a child to an "extended family member" for the purposes of recognizing "that many minor children in this state live with and are well cared for by members of their extended families" because the "parents of these children have often provided for their care by placing them temporarily with another family member who is better able to care for them."
 
 Fla. Stat. § 751.01
 
 (1) (2007) (part of an act (the "Act") entitled: "Temporary Custody of Minor Children by Extended Family"). Through the Act, parents can relatively easily transfer both legal and physical custody of their children to certain relatives.
 
 Fla. Stat. § 751.05
 
 (2007). The Act also provides a simple method for parents to regain full custody of their children-filing the appropriate petition to terminate the custody order and demonstrating to the court that they are "a fit parent," or demonstrating that all parties to the order consent to return of custody to the parent.
 
 Fla. Stat. § 751.05
 
 (6). It is through the procedures set forth in the Act that, with the consent of both Plaintiff and Carter, legal and physical custody of E.R.Q. was transferred to Defendant. North Carolina has no legislation similar to the Act.
 

 ii.
 
 Failure to Preserve Issues
 

 We first hold that Plaintiff has failed to preserve the issues of full faith and credit or what law controls for appellate review. Plaintiff's Action was initiated by Plaintiff's Motion to modify the Florida Order. Plaintiff's Motion expressly and solely requested the remedy of
 
 modification
 

 *413
 

 pursuant to North Carolina law
 
 , specifically N.C.G.S. § 50-13.7. During the ensuing three and a half years, which culminated in a ten-day trial, additional hearings, and entry of the Bickett Order, Plaintiff sought modification of the Florida Order pursuant to N.C.G.S. § 50-13.7, and never gave the trial court any indication she believed the matter should be considered pursuant to Florida law. After her motion to modify the Florida Order was denied by the Bickett Order, Plaintiff filed her Rule 59 "Motion for New Trial."
 

 As discussed above, Plaintiff's Rule 59 motion was not valid. Nonetheless, Plaintiff purported to request a new trial on the basis of,
 
 inter alia
 
 , the following: "the verdict is contrary to law, [and there were] errors in law occurring at trial and objected [to] by [ ] Plaintiff[.]" Plaintiff's language, "errors in law occurring at trial and objected [to] by [ ] Plaintiff[,]" tracks the language of Rule 59(a)(8).
 

 In order to obtain relief under Rule 59(a)(8), a defendant must show a proper objection at trial to the alleged error of law giving rise to the Rule 59(a)(8) motion. Neither defendant's post-trial motion nor the remaining record before us shows a proper objection at trial to any of the rulings at issue. Nothing else appearing, from the record before us, defendant failed to preserve his right to pursue a Rule 59(a)(8) motion.
 

 Davis v. Davis
 
 ,
 
 360 N.C. 518
 
 , 522-23,
 
 631 S.E.2d 114
 
 , 118 (2006). None of the other Rule 59 grounds for a new trial referenced in Plaintiff's motion are applicable to Plaintiff's choice of law argument. The "verdict is contrary to law" language, which tracks part of Rule 59(a)(7), refers to a verdict rendered after a proper proceeding, but that is still in some manner unlawful.
 
 See, e.g.,
 

 Matter of Will of Leonard
 
 ,
 
 71 N.C. App. 714
 
 , 718,
 
 323 S.E.2d 377
 
 , 380 (1984) (citation omitted) (grant of a new trial was proper based upon unlawful verdict because "[t]he jury cannot find both for the plaintiff and the defendant on the same issue"). Plaintiff's arguments that the trial court did not give full faith and credit to the Florida Order, and applied the wrong law, were issues of law that Plaintiff was required to object to prior to or during
 
 *835
 
 trial.
 
 Davis
 
 ,
 
 360 N.C. at 522-23
 
 ,
 
 631 S.E.2d at 118
 
 . Because Plaintiff did not object based upon those issues at trial, those issues were not properly preserved as arguments for Plaintiff's Rule 59 motion for a new trial, and the trial court erred in considering them.
 

 Id.
 

 ;
 
 Barnett v. Security Ins. Co. of Hartford
 
 ,
 
 84 N.C. App. 376
 
 , 380,
 
 352 S.E.2d 855
 
 , 858 (1987).
 

 Absent a proper objection at trial, Plaintiff has also failed to preserve these issues for
 
 appellate
 
 review.
 

 *414
 
 In order to preserve an issue for appellate review, a party must have presented to the trial court a timely request, objection, or motion, stating the specific grounds for the ruling the party desired the court to make if the specific grounds were not apparent from the context. It is also necessary for the complaining party to obtain a ruling upon the party's request, objection, or motion.
 

 N.C. R. App. P. 10(a)(1). Plaintiff did not simply fail to object to the trial court's application of N.C.G.S. § 50-13.7 at trial, she
 
 affirmatively and solely requested
 
 relief pursuant to N.C.G.S. § 50-13.7. Plaintiff may not base an appeal on an alleged error that she invited.
 
 Frugard v. Pritchard
 
 ,
 
 338 N.C. 508
 
 , 512,
 
 450 S.E.2d 744
 
 , 746 (1994) (a party has no right to appeal invited error: "A party may not complain of action which [s]he induced") (citations omitted). This argument is therefore dismissed on these bases as well.
 

 iii.
 
 Merits
 

 We further hold that the rulings in the Bickett Order gave full faith and credit to the Florida Order and properly applied the law of North Carolina. Plaintiff argues: " 'Full Faith and Credit shall be given in each State to the public Acts, Records, and Judicial Proceedings of every other State.' U.S. Const. art. IV, § 1." However, the United States Supreme Court has "declined expressly to settle the question" of whether "custody orders [a]re sufficiently 'final' to trigger [the] full faith and credit requirements" of U.S. Const. art. IV, § 1.
 
 Thompson v. Thompson
 
 ,
 
 484 U.S. 174
 
 , 180,
 
 108 S.Ct. 513
 
 ,
 
 98 L.Ed.2d 512
 
 (1988) (citations omitted). The Court in
 
 Thompson
 
 reasoned:
 

 Even if custody orders were subject to full faith and credit requirements, the Full Faith and Credit Clause obliges States only to accord the same force to judgments as would be accorded by the courts of the State in which the judgment was entered. Because courts entering custody orders generally retain the power to modify them, courts in other States were no less entitled to change the terms of custody according to their own views of the child's best interest. For these reasons, a parent who lost a custody battle in one State had an incentive to kidnap the child and move to another State to relitigate the issue. This circumstance contributed to widespread jurisdictional deadlocks ..., and more importantly, to a national epidemic of parental kidnaping.
 

 *415
 

 Id
 
 . at 180,
 
 108 S.Ct. at 517
 
 ,
 
 98 L.Ed. 2d at 521
 
 (citations omitted). Congress attempted to address this issue by enacting the PKPA, thereby severely limiting the circumstances in which a state could exercise
 
 jurisdiction
 
 to modify a custody order properly entered in another state:
 

 Once a State exercises jurisdiction consistently with the provisions of the [PKPA], no other State may exercise concurrent jurisdiction over the custody dispute, § 1738A(g), even if it would have been empowered to take jurisdiction in the first instance, and all States must accord full faith and credit to the first State's ensuing custody decree.
 

 Id.
 

 , at 177,
 
 108 S.Ct. at 515
 
 ,
 
 98 L.Ed. 2d at 518-19
 
 . The PKPA created a
 
 statutory
 
 requirement that states afford full faith and credit to custody orders initially entered in a different state. This full faith and credit requirement is
 
 not
 
 based upon U.S. Const. art. IV, § 1, the Full Faith and Credit Clause.
 

 Id.
 

 , at 181,
 
 108 S.Ct. at 517
 
 ,
 
 98 L.Ed.2d at 521
 
 ("[t]he context of the PKPA therefore suggests that the principal problem Congress was seeking to remedy was the inapplicability of full faith and credit requirements to custody determinations");
 
 In re Craigo
 
 ,
 
 266 N.C. 92
 
 , 95,
 
 145 S.E.2d 376
 
 , 378 (1965) (Full Faith and Credit Clause does not apply to custody orders);
 

 *836
 

 Williams v. Walker
 
 ,
 
 185 N.C. App. 393
 
 , 400,
 
 648 S.E.2d 536
 
 , 541 (2007).
 

 As discussed above, because of the unique nature of child custody determinations, our Supreme Court has recognized that the rules governing regular civil foreign judgments are different than those governing child custody orders. Both Florida law and the terms of the Florida Order allowed modification of the Florida Order by the Florida court-so long as that court retained jurisdiction. The Florida Order awarded custody of E.R.Q. to Defendant conditioned upon the following relevant provisions: (1) Defendant "is awarded temporary physical and legal custody of ... [E.R.Q.], until the child turns 18 years old or the parents petition for modification of custody under Section 751.05(7), Florida Statutes" and, (2) "
 

 RESERVATIONS
 

 : The [Florida court] retains jurisdiction to enforce
 
 or modify the terms of this final judgment as may, from time to time, become necessary
 
 ." (Emphasis added).
 

 As our Supreme Court held under similar circumstances, since the trial court in North Carolina had
 
 obtained jurisdiction
 
 , it could
 

 consider any change or circumstances that [arose] since the entry of the Florida decree ..., and [it could] determine what [was] for the best interest of the child and [ ] award custody accordingly. But, in disposing of the custody of the minor child in controversy, the Florida decree awarding
 
 *416
 
 her custody to the petitioner is entitled to full faith and credit
 
 as to all matters existing when the decree was entered and which were or might have been adjudicated therein
 
 . "[W]here a decree ... fixing the custody of the children ... is rendered in accordance with the laws of another state by a court of competent jurisdiction, such decree will be given full force and effect in other states as long as the circumstances attending the rendition of the decree remain the same.
 
 The decree has no controlling effect in another state as to the facts and conditions arising subsequent to its rendition
 
 ."
 

 In re Marlowe
 
 ,
 
 268 N.C. 197
 
 , 199-200,
 
 150 S.E.2d 204
 
 , 206-07 (1966) (emphasis added);
 
 [8]
 

 Spence v. Durham
 
 ,
 
 283 N.C. 671
 
 , 683-84,
 
 198 S.E.2d 537
 
 , 545 (1973) ;
 
 Spoon v. Spoon
 
 ,
 
 233 N.C. App. 38
 
 , 44,
 
 755 S.E.2d 66
 
 , 71 (2014). Further, in another case procedurally similar to the present case, our Supreme Court reasoned:
 

 Since this is a case involving modification of a custody order entered with the consent of both parties by a court in California, the controlling statute is N.C.G.S. § 50-13.7. That statute provides in pertinent part:
 

 [W]hen an order for custody of a minor child has been entered by a court of another state, a court of this State may, upon gaining jurisdiction, and a showing of changed circumstances, enter a new order for custody which modifies or supersedes such order for custody.
 

 N.C.G.S. § 50-13.7(b) (1995).
 

 Pulliam v. Smith
 
 ,
 
 348 N.C. 616
 
 , 624,
 
 501 S.E.2d 898
 
 , 902 (1998).
 
 [9]
 
 In
 
 Pulliam
 
 our Supreme Court did not look to California law to determine whether modification of the existing California consent custody order was warranted, it applied the standard mandated by N.C.G.S. § 50-13.7(b).
 

 *417
 
 It is true that the Florida Order granted custody to Defendant pursuant to a procedure not found in North Carolina, and that the Florida Order provided for modification of its terms by the procedure set forth in
 
 Fla. Stat. § 751.05
 
 . However, once the trial court in North Carolina obtained jurisdiction, it had the authority to modify the Florida Order; based upon findings of substantial change in circumstances affecting E.R.Q. and that modification would be in E.R.Q.'s best
 
 *837
 
 interest.
 
 Pulliam
 
 ,
 
 348 N.C. at 624
 
 ,
 
 501 S.E.2d at 902
 
 . Full faith and credit, as well as the UCCJEA, required that the trial court
 
 recognize and enforce
 
 the custody determination made in the Florida Order-that Defendant had legal and physical custody of E.R.Q., and that any attempt to deprive Defendant of custody, absent modification of the Florida Order, would be in derivation of the UCCJEA, but only so long as the Florida Order was not validly modified or vacated.
 
 [10]
 
 Once the trial court obtained jurisdiction, it could only modify the Florida Order pursuant to N.C.G.S. § 50-13.7(b). This does not mean that the trial court was free to ignore the Florida Order, but the terms and intent of the Florida Order had to be considered based upon the circumstances in existence when that order was entered, and further considered within the context of everything that had transpired after entry of the Florida Order. The trial court has broad discretion with respect to custody matters, and is expected to consider all relevant factors when making any custody determination. Assuming,
 
 arguendo
 
 , Plaintiff's arguments were properly before us, we would reject Plaintiff's arguments concerning jurisdiction, full faith and credit, and application of North Carolina law to Plaintiff's Action, and affirm the trial court's denial of Plaintiff's Motion.
 

 c.
 
 Conduct Inconsistent with Protected Status as a Parent
 

 Plaintiff argues that the trial court erred in finding and concluding "by clear cogent and convincing evidence that [ ] Plaintiff [ ] acted inconsistently with her constitutionally protected status to parent her child." We disagree.
 

 "[W]e review [a] conclusion [that the natural parent's conduct was inconsistent with her constitutionally protected right]
 
 de novo
 
 , and determine whether it is supported by 'clear and convincing evidence.' "
 
 Boseman v. Jarrell
 
 ,
 
 364 N.C. 537
 
 , 549,
 
 704 S.E.2d 494
 
 , 502 (2010) (citations omitted).
 

 *418
 
 "[T]here is no bright line beyond which a parent's conduct meets this standard. As we explained in
 
 Price
 
 [
 
 v. Howard
 
 ,
 
 346 N.C. 68
 
 , 79,
 
 484 S.E.2d 528
 
 , 534 (1997) ], conduct rising to the 'statutory level warranting termination of parental rights' is unnecessary. Rather, '[u]nfitness, neglect, and abandonment clearly constitute conduct inconsistent with the protected status parents may enjoy. Other types of conduct ... can also rise to this level so as to be inconsistent with the protected status of natural parents.' "
 

 Id.
 

 at 549-50
 
 ,
 
 704 S.E.2d at 503
 
 (citations omitted).
 
 [11]
 
 "[A] natural parent's execution of a valid consent judgment granting exclusive care, custody, and control of a child to a nonparent, may be a factor upon which the trial court could base a conclusion that a parent has acted inconsistently with his or her constitutionally protected status."
 
 Yurek v. Shaffer
 
 ,
 
 198 N.C. App. 67
 
 , 77,
 
 678 S.E.2d 738
 
 , 745 (2009) (citations omitted);
 
 see also
 

 Adams v. Tessener
 
 ,
 
 354 N.C. 57
 
 , 61-62,
 
 550 S.E.2d 499
 
 , 502 (2001) (when a parent voluntarily relinquishes custody to a non-parent for a significant period of time, this may constitute a basis for making a determination that the parent has acted inconsistently with her constitutionally protected status).
 

 As our Supreme Court has determined:
 

 [T]he United States Supreme Court has also recognized that protection of the parent's interest is not absolute. .... The Court pointed out its traditional adherence to the principle that "the rights of the parents are a counterpart of the responsibilities they have assumed." In discussing this principle, the Court stated:
 

 Thus, the "liberty" of parents to control the education of their children that was vindicated in [prior opinions] was described as a "right, coupled with the high duty, to recognize and prepare [the child] for additional obligations." The linkage between parental duty and parental right was stressed again ... when
 
 *838
 
 the Court declared it a cardinal principle "that the custody, care and nurture of the child reside
 
 *419
 
 first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder." In these cases the Court has found that the relationship of love and duty in a recognized family unit is an interest in liberty entitled to constitutional protection.
 

 In
 
 Lehr
 
 , the Court stressed the linkage between parental duty and parental right and noted that the father in that case had "never had any significant custodial, personal, or financial relationship with [the child], and he did not seek to establish a legal tie until after she was two years old." The Court reasoned that
 

 [w]hen an unwed father demonstrates a full commitment to the responsibilities of parenthood by "com[ing] forward to participate in the rearing of his child," his interest in personal contact with his child acquires substantial protection under the Due Process Clause. At that point it may be said that he "act[s] as a father toward his children." But the mere existence of a biological link does not merit equivalent constitutional protection.
 

 The Court further stated, " '[T]he importance of the familial relationship, to the individuals involved and to the society, stems from the emotional attachments that derive from the intimacy of daily association, and from the role it plays in "promot[ing] a way of life" through the instruction of children as well as from the fact of blood relationship.' "
 

 Price
 
 ,
 
 346 N.C. at 76-77
 
 ,
 
 484 S.E.2d at 533
 
 (citations omitted).
 

 In
 
 Boseman
 
 , our Supreme Court discussed
 
 Price
 
 , stating:
 

 Thus, under
 
 Price
 
 , when a parent brings a nonparent into the family unit, represents that the nonparent is a parent, and voluntarily gives custody of the child to the nonparent without creating an expectation that the relationship would be terminated, the parent has acted inconsistently with her paramount parental status.
 

 Boseman
 
 ,
 
 364 N.C. at 550-51
 
 ,
 
 704 S.E.2d at 503
 
 (citations omitted). In
 
 Boseman
 
 , upon the parent-mother's initiation, she and a nonparent boyfriend were
 
 jointly
 
 raising the child and participating
 
 equally
 
 in parenting decisions-resulting in a stable, long-term family unit. "As
 
 *420
 
 such, the natural parent created along with the nonparent a family unit in which the two acted as parents, shared decision-making authority with the nonparent, and [by their actions] manifested an intent that the arrangement exist indefinitely."
 

 Id.
 

 at 551
 
 ,
 
 704 S.E.2d at
 
 504 ;
 
 see also
 

 Id.
 

 at 552
 
 ,
 
 704 S.E.2d at 504
 
 .
 
 [12]
 

 Although the Florida Order was "temporary" and included a provision whereby Plaintiff could regain custody pursuant to a simplified process, absent specific action taken by Plaintiff, Defendant was granted full legal and physical custody of E.R.Q. until E.R.Q. reached adulthood. We hold that Plaintiff's actions-and failure to act-after she "voluntarily [gave] custody of [E.R.Q.] to [Defendant],"
 

 Id.
 

 at 550-51
 
 ,
 
 704 S.E.2d at 503
 
 (citations omitted), satisfies the requirement that Plaintiff did not "creat[e] an expectation that the relationship [between Defendant and E.R.Q.] would be terminated" at some point in the future.
 

 Id.
 

 at 550-51
 
 ,
 
 704 S.E.2d at 503
 
 . We base our holding in part on Plaintiff's lack of meaningful interaction with E.R.Q. for a period of years, and on the fact that, other than the Florida action Plaintiff filed in 2009 then abandoned, Plaintiff failed to make any formal attempt to regain custody of E.R.Q. for over six years.
 

 *839
 
 Further, in
 
 Boseman
 
 ,
 
 Price
 
 , and other opinions cited therein, the biological parent continued to "act as a parent," exercising control and providing support, but also decided to
 
 share
 
 those parental rights and obligations with a nonparent. In the present case, Plaintiff completely relinquished her parental responsibilities to Defendant for a period of years, and the only familial bond that occurred during those years was between Defendant and E.R.Q.
 
 Price
 
 ,
 
 346 N.C. at 76-77
 
 ,
 
 484 S.E.2d at 533-34
 
 .
 

 We wish to make clear that Plaintiff's voluntary relinquishment of custody to Defendant pursuant to the Florida Order, standing alone, should not in any manner be considered an act contrary to her protected status as a parent. The Florida statutes provide that option for a salutary
 
 *421
 
 purpose, and the use of those statutes for voluntary temporary relinquishment of custodial rights no doubt demonstrate acts of parental love and responsibility in most instances. Plaintiff's recognition that Defendant was in a better position to care for E.R.Q.
 
 at the time Plaintiff consented to entry of the Florida Order
 
 is presumed by this Court to have been an act of parental responsibility. However, Plaintiff's actions subsequent to entry of the Florida Order reflect either a lack of ability, or desire, to take on even minimal continuing acts of parental love or responsibility. Our Supreme Court has "emphasized that evidence of a parent's conduct should be viewed cumulatively."
 
 Owenby v. Young
 
 ,
 
 357 N.C. 142
 
 , 147,
 
 579 S.E.2d 264
 
 , 267 (2003). The fact that Plaintiff, after years of inaction, eventually decided to make a concerted effort to regain custody of E.R.Q. should be considered in the analysis, but weighed in light of the many years in which Plaintiff fully relinquished her parental duties to Defendant. The relevant evidence presented in this case is exhaustively examined above, and we need not revisit it.
 

 We hold, upon
 
 de novo
 
 review, that the determination that Plaintiff's conduct had been inconsistent with her constitutionally protected status as a parent was supported by clear and convincing evidence.
 
 Boseman
 
 ,
 
 364 N.C. at 549
 
 ,
 
 704 S.E.2d at
 
 502 ;
 
 Owenby
 
 , 357 N.C. at 147,
 
 579 S.E.2d at 268
 
 . The Bickett Order is affirmed and reinstated.
 

 B.
 
 Defendants' Appeal
 

 1. Jurisdiction to Enter the Randolph Order
 

 Defendant argues that Judge Randolph lacked subject matter jurisdiction to enter the 17 November 2016 Randolph Order. We agree.
 

 We first recognize that once the district court obtains jurisdiction over a child custody matter, that jurisdiction continues until the child reaches the age of majority, or some other factor serves to divest the district court of jurisdiction.
 
 See
 
 N.C.G.S. § 50A-202 ;
 
 Beck v. Beck
 
 ,
 
 64 N.C. App. 89
 
 , 93,
 
 306 S.E.2d 580
 
 , 582 (1983). Judge Bickett's recusal did not affect the continuing jurisdiction of the trial court over the subject matter of this action. However, the trial court may still lack jurisdiction to act in certain circumstances-for instance, as discussed below, when the matter is on appeal. As we discussed above in determining that Plaintiff had failed to timely file her notice of appeal from the Bickett Order, Plaintiff's purported Rule 59 motion for a new trial was not a proper Rule 59 motion.
 
 [13]
 
 Therefore, Plaintiff never presented any proper
 
 *422
 
 Rule 59 motion to the trial court, and the trial court never obtained jurisdiction over the subject matter of Plaintiff's purported Rule 59 motion.
 
 See
 

 Meehan v. Cable
 
 ,
 
 135 N.C. App. 715
 
 , 721,
 
 523 S.E.2d 419
 
 , 423 (1999). Absent jurisdiction to hear Plaintiff's Rule 59 motion, the trial court could not enter any valid order deciding Plaintiff's motion.
 
 In re J.H.
 
 ,
 
 244 N.C. App. 255
 
 , 259-260,
 
 780 S.E.2d 228
 
 , 233 (2015).
 

 In addition, the Randolph Order was heard "on [ ] Plaintiff's Motion for New Trial, filed in response to the May 16, 2016 [Bickett] Order." In Plaintiff's motion for a new trial, she limited the bases for granting a new trial to those set forth "pursuant to Rule 59 of the N.C. Rules of Civil Procedure[.]" It is axiomatic that "[o]ne superior court judge may not overrule another."
 
 Able Outdoor, Inc. v. Harrelson
 
 ,
 
 341 N.C. 167
 
 , 169,
 
 459 S.E.2d 626
 
 , 627 (1995) (citations omitted).
 

 *840
 
 However, "[i]f Judge [Bickett] did not have jurisdiction to act ..., his order was a nullity and Judge [Randolph] could strike it."
 
 Id
 
 . This Court has specifically held that a judge who did not hear a case may not hear a Rule 59 motion for a new trial.
 
 Sisk v. Sisk
 
 ,
 
 221 N.C. App. 631
 
 , 636,
 
 729 S.E.2d 68
 
 , 72 (2012) (judge who did not preside at trial "was without jurisdiction to enter an order on plaintiff's motion for new trial" pursuant to Rule 59 ).
 

 Because we have held that Judge Bickett did have jurisdiction to enter the 16 May 2016 order, it was error for Judge Randolph to consider Plaintiff's 23 May 2016 motion for a new trial. "[A] judge who did not try a case may not rule upon a motion for a new trial. Judge [Randolph] was without jurisdiction to hear [P]laintiff's Rule 59 motion for a new trial."
 
 Sisk
 
 ,
 
 221 N.C. App. at 633
 
 ,
 
 729 S.E.2d at 70
 
 (citations omitted). Because Judge Randolph lacked subject matter jurisdiction to hear Plaintiff's Rule 59 motion, the Randolph Order is void. Plaintiff argues that the rule in
 
 Sisk
 
 should not apply because Judge Bickett recused himself from participating in Plaintiff's Action. Plaintiff cites no authority for this position. It is true that a different judge than the one who presided at a trial may step in and perform certain acts-such as entering the order of the prior judge-pursuant to N.C. Gen. Stat. § 1A-1, Rule 63 (2017).
 
 See
 

 In re Savage
 
 ,
 
 163 N.C. App. 195
 
 , 197,
 
 592 S.E.2d 610
 
 , 611 (2004). However, this Court has held that "[t]he function of a substitute judge under [ Rule 63 ] is 'ministerial rather than judicial.' "
 

 Id.
 

 (citation omitted). " Rule 63 does not contemplate that a substitute judge, who did not hear the witnesses and participate in the trial, may nevertheless participate in the decision making process. It contemplates only ... [performing] such acts as are necessary under our rules of procedure to effectuate a decision already made."
 
 Id.
 
 at 198,
 
 592 S.E.2d at 611
 
 (citations and quotation marks omitted). The trial court lacked jurisdiction
 
 *423
 
 to hear and decide Plaintiff's Rule 59 motion for a new trial on the
 
 two separate bases
 
 discussed above. We therefore vacate the 17 November 2016 Randolph Order.
 

 2. Additional Issues
 

 We take this opportunity to stress that a court without subject matter jurisdiction can do nothing more than recognize its lack of jurisdiction and make rulings that are directly consequent to that determination. Any additional action taken would be a nullity and unenforceable. However, because the orders of a trial court are not likely to be ignored, the trial court should strive to avoid confusion by refraining from including findings, conclusions, or decretal statements that lack legal effect. Had the trial court been correct in ruling in the Randolph Order that it lacked subject matter jurisdiction, it would have therefore lacked jurisdiction to make any additional substantive rulings. Subject matter jurisdiction is a prerequisite to any binding judicial determination. Therefore, it was improper for the trial court,
 
 after determining that it lacked subject matter jurisdiction
 
 , to conclude "that there exist sufficient grounds under ... Rule 59 to warrant a new trial, if this [c]ourt obtains subject matter jurisdiction. This [c]ourt should give Full Faith and Credit to Florida law." It was equally improper for the trial court to decree that "Plaintiff's Motion for a New Trial is granted, if Florida releases subject matter jurisdiction to North Carolina[,]" and that "Florida law applies to the interpretation of" the Florida Order.
 
 See
 

 Town of Tryon v. Duke Power Co.
 
 ,
 
 222 N.C. 200
 
 ,
 
 22 S.E.2d 450
 
 , 453 (1942).
 

 III.
 
 COA17-1344
 

 Defendant, by separate appeal in COA17-1344, appeals from the 2017 Order-Judge Randolph's 28 March 2017 "Child Custody Order." Defendant argues that the trial court lacked jurisdiction to enter the 2017 Order. We agree.
 

 "An appeal is not 'perfected' until it is docketed in the appellate court, but when it is docketed, the perfection relates back to the time of notice of appeal, so any proceedings in the trial court after the notice of appeal are void for lack of jurisdiction."
 
 Romulus v. Romulus
 
 ,
 
 216 N.C. App. 28
 
 , 33,
 
 715 S.E.2d 889
 
 , 892 (2011) (citation omitted). It is well established:
 

 *841
 
 When an appeal is perfected as provided by this Article it stays all further proceedings in the court below upon the judgment appealed from, or upon the matter embraced therein, unless otherwise provided by the Rules of
 
 *424
 
 Appellate Procedure; but the court below may proceed upon any other matter included in the action and not affected by the judgment appealed from.
 

 N.C. Gen. Stat. § 1-294
 
 (2017). There are certain exceptions to this rule: "Notwithstanding the provisions of G.S. 1-294, an order pertaining to child custody which has been appealed to the appellate division
 
 is enforceable
 
 in the trial court by proceedings for civil contempt during the pendency of the appeal."
 
 N.C. Gen. Stat. § 50-13.3
 
 (2017) (emphasis added).
 

 Subsequent to Defendant's 16 December 2016 filing of her notice of appeal in COA17-675, which was perfected, Plaintiff filed a 4 January 2017 "Verified Motion in the Cause to Terminate Order for Temporary Custody" (the "Verified Motion") in which Plaintiff requested termination of the Florida Order "pursuant to Ch. 751.05(6), Florida Statutes." The trial court heard arguments on the Verified Motion on 14 March 2017, and then entered the 2017 Order. In the 2017 Order, the trial court concluded that it "should give Full Faith and Credit to Florida law" and decide the matter based upon Florida law. The 2017 Order purported to terminate the Florida Order, and award full legal and physical custody of E.R.Q. to Plaintiff.
 

 Plaintiff makes several unavailing arguments in support of her contention that the trial court had jurisdiction to enter the 2017 Order even though the Bickett Order and the Randolph Order were on appeal in COA17-675. Plaintiff argues that the language in N.C.G.S. § 1-294 that an appeal "stays all further proceedings in the court below upon the judgment appealed from, or upon the matter embraced therein," does not apply in this matter because the issues decided in the 2017 Order were not "matters embraced" by the Bickett and Randolph Orders. However, in order to reach its ruling in the 2017 Order, the trial court had to "affirm" its own 17 November 2016 order-the Randolph Order-by implicit rulings that (1) Judge Bickett lacked subject matter jurisdiction to enter the Bickett Order pursuant to the UCCJEA; (2) it had the authority and jurisdiction to rule on Plaintiff's Rule 59 motion; (3) Plaintiff had not forfeited her constitutionally protected status as a parent; (4) Plaintiff's conduct had not served to alter the original nature of the Florida Order; (5) Florida law controlled the North Carolina trial court's authority to modify the Florida Order, even after North Carolina obtained subject matter jurisdiction pursuant to the UCCJEA; (6) a North Carolina trial court can modify a custody order from another state without any finding of changed circumstances or a determination of whether modification would be in the best interest of the child- N.C.G.S. § 50-13.7(b)
 

 *425
 
 notwithstanding; and (7) that Plaintiff's motion for a new trial should be granted.
 
 See
 

 Carpenter v. Carpenter
 
 ,
 
 25 N.C. App. 307
 
 , 308-09,
 
 212 S.E.2d 915
 
 , 916 (1975) (the purpose of N.C.G.S. § 1-294 is to prevent the trial court from deciding the very matters that were embraced in a previous order). Our resolution of the appeal in COA17-675 includes holdings directly contrary to each of these implied rulings of the trial court in the 2017 Order.
 

 Further, this Court has clearly held that an appeal from an order involving child custody removes jurisdiction from the trial court to consider
 
 any
 
 issues related to custody of the child involved:
 

 We find that the district court lacked the authority to issue the 31 October 1986 and 3 November 1986 orders, and, conclude that these orders are null and void for the following reason.
 

 N.C.G.S. § 1-294 states in part:
 

 When an appeal is perfected as provided by this Article it stays all further proceedings in the court below upon the judgment appealed from, or upon the matter embraced therein; but the court below may proceed upon any other matter included in the action and not affected by the judgment appealed from.
 

 It is established that "[v]isitation privileges are but a lesser degree of custody." As a result, the 5 March 1986 order, extending visitation rights, appealed by defendant is directly related to and will affect the 31
 
 *842
 
 October 1986 and 3 November 1986 orders determining custody, issued by the trial court. Therefore, N.C.G.S. § 1-294 removed jurisdiction on the issue of custody from the district court in the present case.
 

 Furthermore, the Supreme Court in
 
 Joyner v. Joyner
 
 ,
 
 256 N.C. 588
 
 ,
 
 124 S.E.2d 724
 
 (1962), specifically addressed the question of who has jurisdiction over a minor child when a custody matter is pending on appeal. In
 
 Joyner
 
 , the Court concluded that "North Carolina cases fit into the general rule that appeal removes the entire proceeding to the [appellate] Court and leaves the [lower] court
 
 functus officio
 
 until the cause is remanded."
 

 Consequently, under both statute and case law the district court lost jurisdiction over all custody matters in the
 
 *426
 
 present case when defendant appealed the 5 March 1986 visitation order.
 

 Hackworth v. Hackworth
 
 ,
 
 87 N.C. App. 284
 
 , 286-87,
 
 360 S.E.2d 472
 
 , 472-73 (1987) (citations omitted);
 
 [14]
 

 see also
 

 Rosero v. Blake
 
 ,
 
 150 N.C. App. 250
 
 , 252-54,
 
 563 S.E.2d 248
 
 , 250-51 (2002),
 
 rev'd on other grounds
 
 ,
 
 357 N.C. 193
 
 ,
 
 581 S.E.2d 41
 
 (2003).
 

 Plaintiff argues "[i]t is logical that a 'matter' wherein the Court of North Carolina [sic] has subject matter jurisdiction is a separate 'matter' from one in which North Carolina does not have subject matter jurisdiction." The issue of subject matter jurisdiction was one of the central issues on appeal in COA17-675, which is enough to defeat Plaintiff's argument. Plaintiff's argument is further discredited by the fact that her assumption that this Court would determine that the trial court lacked jurisdiction to enter the Bickett Order in the COA17-675 appeal was not only an improper assumption to make, but incorrect as well.
 

 Because prior orders involving the custody of E.R.Q.-the Bickett Order and the Randolph Order-were on appeal in COA17-675, the trial court was without jurisdiction to hear or decide any issues directly related to E.R.Q.'s custody during the pendency of the COA17-675 appeal.
 
 Carpenter
 
 ,
 
 25 N.C. App. at 309
 
 ,
 
 212 S.E.2d at 916
 
 (citations omitted) ("[P]ending the appeal the trial judge is
 
 functus officio
 
 . Therefore, the [trial c]ourt in the present case had no jurisdiction to hear and pass upon defendant's motion filed on 19 November 1974 while the appeal of this case was pending in the Court of Appeals."). Because the matter of E.R.Q.'s custody was on appeal when the trial court entered the 2017 Order, that order is void and of no effect.
 

 From the evidence included in the record concerning the 2017 Order, it appears E.R.Q. was erroneously removed from Defendant on 2 April 2017 by a court without jurisdiction to do so. This Court now holds that custody of E.R.Q. was never properly removed from Defendant and, based on our holdings, legal custody of E.R.Q. continues to reside with Defendant, and physical custody of E.R.Q. must be returned to Defendant.
 

 *427
 
 IV.
 
 Visitation
 

 Of the orders appealed in COA17-675 and COA17-1344, only the Bickett Order survives-the Randolph Order and the 2017 Order are void and vacated. We note that though Defendant's 8 January 2013 responsive pleading to Plaintiff's initial motion in the cause-in effect, Defendant's answer and counterclaims-"prayed" the trial court order that "Defendant be given permanent custody of [E.R.Q.,]" and grant Plaintiff "supervised visitation" with E.R.Q., it does not appear from the record that the counterclaims in Defendant's responsive pleading have been decided by the trial court.
 

 Plaintiff and Defendant have thus far handled the issue of visitation in this matter through temporary consent orders. Plaintiff and Defendant first "agreed on a temporary modification of child custody pending trial," and this agreement was entered as a temporary consent custody order on 1 May 2013. That consent order provided Plaintiff with certain visitation and other rights to which she had not previously been legally entitled.
 

 *843
 
 Additional consent orders modifying custody/visitation rights were entered prior to entry of the Bickett Order.
 

 Following entry of the Bickett Order-and Plaintiff's motion for a new trial-Plaintiff and Defendant again agreed on a modified visitation schedule, which was entered as a "Temporary Custody Order" on 7 September 2016. The trial court entered an order on 13 December 2016 in which it, with the agreement of Plaintiff and Defendant, modified a visitation provision of the 7 September 2016 temporary custody order. It further ruled that, "[e]xcept as modified herein, the Temporary Custody Order filed 09/07/2016 remains in full force and effect, subject to the contempt powers of the [c]ourt." Defendant filed her notice of appeal from the Randolph Order on 16 December 2016, and Plaintiff filed her notice of appeal from the Bickett Order on 19 December 2016. Therefore, these orders establishing a visitation schedule were entered before jurisdiction over the matter was removed from the trial court to this Court by appeal. N.C.G.S. § 1-294.
 

 Though the 2017 Order purported to "supersede[ ] and vacate all other North Carolina Orders in this court file[,]" the 2017 Order is void and of no effect. Neither Plaintiff nor Defendant have challenged the 13 December 2016 consent order on appeal. Therefore, the visitation provisions included and incorporated into the 13 December 2016 consent order are the last visitation provisions agreed upon by Plaintiff and Defendant and entered as a temporary consent custody order. Since the 2017 Order is a nullity, the 13 December 2016 consent order remains in effect until it is modified, vacated, or made permanent by the trial court.
 

 *428
 
 V.
 
 Conclusion
 

 Based upon our holdings above, we reach the following dispositions: (1) Although Plaintiff's appeal could be dismissed for failure to timely file notice of appeal from the 16 May 2016 Bickett Order, we grant
 
 certiorari sua sponte
 
 and address Plaintiff's arguments; (2) pursuant to our analyses above, we dismiss or reject Plaintiff's arguments on appeal and affirm the 16 May 2016 Bickett Order; (3) we vacate the 17 November 2016 Randolph Order on two independent grounds-(a.) Plaintiff's purported 23 May 2016 Rule 59 motion for a new trial was insufficient to confer subject matter jurisdiction on the trial court, and (b.) because Judge Bickett had subject matter jurisdiction when he entered the Bickett Order, Judge Randolph could not "overrule" the Bickett Order and substitute his own judgment for the prior judgment of Judge Bickett; (4) the Bickett Order is currently the controlling order in this matter, and any actions taken by the trial court that conflict with the rulings in the Bickett Order are rendered void and must be corrected; (5) the appeal in COA17-675 divested the trial court of jurisdiction to consider Plaintiff's Verified Motion, therefore the 2017 Order appealed in COA17-1344 is void and vacated; (6) Pursuant to the Bickett Order, legal and physical custody of E.R.Q. remains with Defendant as initially directed by the Florida Order; (7) because physical custody of E.R.Q. was improperly removed from Defendant, physical custody of E.R.Q. must be returned to Defendant; (8) the trial court shall use its discretion in weighing Defendant's right to immediate physical custody against E.R.Q.'s welfare when determining when and how to return E.R.Q. to Defendant's physical custody,
 
 but the return of E.R.Q. to Defendant's physical custody shall not be unreasonably delayed
 
 ; (9) because the 2017 Order is void, legal custody of E.R.Q. has remained with Defendant since entry of the Florida Order, though the effect of entry of the 2017 Order was to deprive Defendant of the rights attendant to her legal custody of E.R.Q.; therefore, Defendant's right to exercise her legal custodial rights shall be immediately restored, with the following caveat; (10) the trial court may impose
 
 temporary
 
 restrictions on Defendant's legal custodial rights upon a determination that such restrictions are required to prevent unnecessary stress or hardship for E.R.Q.;
 
 [15]
 
 (11) the visitation
 
 *844
 
 orders
 
 *429
 
 entered by the trial court, culminating in the 13 December 2016 order, remain in effect until modified or vacated by the trial court; (12) the trial court, preferably pursuant to a consent agreement, shall establish a temporary visitation plan that best serves the interests of E.R.Q. for the transition period prior to return of physical custody to Defendant;
 
 [16]
 
 (13) nothing in this opinion should be interpreted as interfering with the continuing jurisdiction of the trial court over this matter, and the trial court shall continue to resolve any custody-related issues that may arise, as long as they have not been finally resolved by this opinion or prior valid orders of the trial court; (14) the trial court may not revisit certain issues that have become the law of this case including, but not limited to, the correct law to apply if modification of the Florida Order is again sought, jurisdictional issues decided in this opinion, and prior rulings of the trial court that have either not been challenged or that have been upheld on appeal; and (15) that Plaintiff has lost her constitutionally protected status as a parent is an issue that has been finally decided and that may not be revisited by the trial court.
 

 COA17-675: PLAINTIFF'S APPEAL DISMISSED, 16 MAY 2016 ORDER AFFIRMED; 17 NOVEMBER 2016 ORDER VACATED; REMANDED. COA17-1344: 26 MARCH 2017 ORDER VACATED; REMANDED.
 

 Judge MURPHY concurs.
 

 Judge BRYANT concurs in result only.
 

 [1]
 

 At this time, Plaintiff and Woolf were living in Texas due to Woolf's job. By the time of the Bickett Order, Plaintiff and Woolf had moved to Northern Virginia.
 

 [2]
 

 The relationship between Defendant and Kresge ended sometime before Plaintiff filed this action, and Kresge moved out of the house.
 

 [3]
 

 That the requirements for modification pursuant to N.C.G.S. § 50-13.7 had not been met.
 

 [4]
 

 By filing her 15 November 2012 "Motion in the Cause for Modification of a Prior Order," which initiated the present action, and by arguing, exclusively, over years of litigation and many days of hearings, that Plaintiff had met the requirements of N.C.G.S. § 50-13.7 for modification of the Florida Order.
 

 [5]
 

 Only the transcript for 7 September 2016 appears in the record.
 

 [6]
 

 With the exception of temporary emergency jurisdiction, which may be exercised by a court without ECJ when a child's welfare requires immediate action. N.C.G.S. § 50A-204.
 

 [7]
 

 This portion of the statute has since been amended.
 

 [8]
 

 The jurisdictional rules set forth in the UCCJEA supersede prior jurisdictional rules. However, the fact that a court with jurisdiction can always modify a custody order, whether from this State or another, upon a showing of substantially changed circumstances and in accordance with the best interests of the child, remains the law of this State.
 

 [9]
 

 N.C.G.S. § 50-13.7(b) has been amended to clarify that modification is "[s]ubject to the provisions of G.S. 50A-201, 50A-202, and 50A-204" of the UCCJEA.
 

 [10]
 

 Again, excepting for emergency jurisdiction provisions as set forth in N.C.G.S. § 50A-204.
 

 [11]
 

 When a natural parent loses her constitutionally protected status, custody of a child as between that parent and a non-parent is decided using the best interest of the child standard as stated in
 
 N.C. Gen. Stat. § 50-13.2
 
 (a) (2017).
 
 Price
 
 ,
 
 346 N.C. at 84
 
 ,
 
 484 S.E.2d at 537
 
 .
 

 [12]
 

 "[W]e recognize that there are circumstances where the responsibility of a parent to act in the best interest of his or her child would require a temporary relinquishment of custody, such as under a foster-parent agreement or during a period of service in the military, a period of poor health, or a search for employment. However, to preserve the constitutional protection of parental interests in such a situation, the parent should notify the custodian upon relinquishment of custody that the relinquishment is temporary, and the parent should avoid conduct inconsistent with the protected parental interests. Such conduct would, of course, need to be viewed on a case-by-case basis, but may include
 
 failure to maintain personal contact with the child or failure to resume custody when able
 
 ."
 
 Price
 
 ,
 
 346 N.C. at 83-84
 
 ,
 
 484 S.E.2d at 537
 
 (emphasis added).
 

 [13]
 

 See section II., A., 1. of this opinion.
 

 [14]
 

 The adoption of the provision in N.C.G.S. § 50-13.3 to allow a trial court to enforce custody orders pursuant to its contempt powers did not "overrule"
 
 Joyner
 
 , as Plaintiff argues. It simply created a new, specific, and limited right. The general principle acknowledged in
 
 Joyner
 
 survives, as evidenced by
 
 Hackworth
 
 and other opinions citing
 
 Joyner
 
 for this principle subsequent to adoption of the relevant provision in N.C.G.S. § 50-13.3.
 

 [15]
 

 By way of example only, and not intended to be binding or limiting on the discretion of the trial court, the trial court could immediately transfer authority to make certain major decisions involving E.R.Q.-e.g. major medical decisions, or other decisions likely to significantly impact E.R.Q.'s physical, mental, or social welfare-to Defendant, but grant Plaintiff temporary authority to make necessary day-to-day logistical decisions concerning E.R.Q. until transfer of physical custody is achieved.
 

 [16]
 

 Of course, as long as the trial court retains jurisdiction, it may revisit custody/visitation issues concerning E.R.Q. when they are properly before the court.